1.

# Deposition Excerpts of Floyd E. Nelson

## FREEDOM COURT REPORTING

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FRANK H. KRUSE, as the
Administrator of the
Estate of PAUL L. LANE,
Deceased,

Plaintiff,

vs.                    CASE NO. 07-0399-C

CHARLES V. DURBIN;
HIGHWAY TRANSPORT, INC.;
et al.,

Defendants.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF FLOYD E. NELSON,
taken pursuant to stipulation and
agreement before Audra Kirkland, Court
Reporter and Commissioner for the State
of Alabama at Large, in the Law Offices
of Miller, Hamilton, Snider & Odom,
254 State Street, Mobile, Alabama, on
Tuesday, August 5, 2008, commencing at
approximately 9:37 a.m.

\* \* \* \* \* \* \* \* \* \*

unusual because he worked for me. Sometime he -- him and my wife was very close. He done electrical work for me. When she wanted something special done in the house, she got him to do it because he had patience and he'd clean up his mess she says.

Q. That seems to be important to wives, doesn't it?

(Laughter)

A. Yes, it does.

Q. Had you ever ridden with him from Atmore to Grand Bay?

A. No; not as I can recall. But I have rode with him before.

Q. The night of this accident, do you have any idea what time he may have arrived at the church?

A. That night -- that day Elder Paul Lane come to my church early, at least, I would say, an hour and a half or two hours before that service and found me that day. We drunk coffee together and

he sat down in my office.  I was
working.  And he had a ball with me
that day.

Q.  What time did that service start?

A.  Seven o'clock.

Q.  Okay.  So he could have gotten there as
early at five p.m.?

A.  At least --

Q.  Okay.

A.  -- five.

Q.  And y'all had coffee?

A.  Coffee.  And he always wanted to give
me update of what he do.

Q.  Okay.

A.  And we sit down -- he had an open door
with me.

Q.  Right.

A.  He had an open door with me.

Q.  Do you remember what y'all may have
talked about that he'd been doing that
day or the few days before?

A.  Well, we talk about a lot of things and
I couldn't say nothing per --

Q. Nothing out of the ordinary?

A. Nothing our of ordinary.

Q. Had Mr. Lane ever made any complaints to you about any sort of physical problems that he ever had?

A. He was very healthy.

Q. Okay. All right. Did you ever notice him having a hearing loss or anything like that?

A. Not really. No.

Q. As far as you know, he was very healthy for seventy-eight?

A. Extra --

Q. Okay.

A. -- healthy.

Q. All right. Y'all visited for a couple of hours before the service started?

A. That is correct.

Q. Did you attend the service?

A. That is correct.

Q. Do you remember what his sermon was about?

A. Well, he talked about a rock and he

just -- I mean, it's -- he was a demonstrator. He loved to demonstrate. He just -- he demonstrated his messages and he -- he based his message upon demonstration more than anything. And -- and he had his demonstration of a rock and he brought a rock and he discussed it and he talked about the significance of a rock and the power of a rock.

Q. About the foundations of faith and things like that?

A. Right.

Q. How long do you think his sermon lasted?

A. From about thirty to forty-five minutes, no more than an hour.

Q. How long is the -- let me ask you this, do y'all have a set ending time for your sermon -- I mean not sermon, but your services, I'm talking?

A. Not a set time, but it will last 'til about nine, not much after nine.



Q. Okay. The night of this accident, do you think it ended around nine o'clock?

A. I -- I -- I believe it ended at nine.

Q. Now at my church, service is over, we still talk and it piles out into the lobby or out on the steps and talk to the minister and visits with friends and things like that. Is that how it is at --

A. That is correct.

Q. Okay.

A. And that night, after going on -- his last words to me was, I will see you later, Pharaoh. He calls me Pharaoh. I'm a driver. I love to drive. I -- and he worked for me and he named me Pharaoh because I could get things done. And that was a good joke to him and I, but he called me Pharaoh. He said, I see you later, Pharaoh, every -- that was most -- that's -- that's his goodbye. Any time he see me he would call me Pharaoh. He greet me

with, Hey, Pharaoh.  I mean, that's --

Q.  Okay.

A.  That was his greeting.  That's a hard task master.

Q.  Did you say he drove you sometimes?

A.  He have drove me.  I have rode with him.

Q.  Okay.  Would you drive your car or would you drive his car?  Or how would that normally work?

A.  Well, I know one case -- occasion he had a van and he was down there working and he needed to go pick up some electrical stuff and we jumped -- I jumped in the van with him and we went to the supply house.  I do remember that one.  And none of the trips actually was over eight miles or --

Q.  Okay.

A.  -- something like that.

Q.  I may have -- it may have been a bad assumption on my part when you said he drove you sometimes.  It seemed to me

that maybe he drove you to different churches?

A. No.

Q. Anything like that?

A. No, no.

Q. Okay.

A. No.

Q. All right. After the service, did he have a chance to visit with some of the people in the church there that evening?

A. I don't know who all he visit after church because after service I mostly have to go back in my office for a minute and then I come out, the majority be gone.

Q. When did he say -- when did he say --

A. He come back to the door --

Q. Okay.

A. -- to my office and stuck his head in there and says, See you later, Pharaoh.

Q. Do you happen to remember what time he said that?

A.   Well, it was in the area of nine o'clock, or somewhere in there, not looking at the clock.

Q.   Okay.  Do you think it was --

A.   Nineish, ten.  Nine, ten-fifteen.  Maybe nine.

Q.   Somewhere between nine and ten?

A.   I hardly ever stay there over fifteen after service unless I have work to do.

Q.   Okay.  You didn't see him leave the church premises that night, did you?

A.   No.

Q.   Okay.  Did you have a chance to see his vehicle when he arrived at the church that afternoon?

A.   Yes.

Q.   Okay.  Did you see it when he left?

A.   No.

Q.   Okay.  Was there anything about the vehicle that you noticed that was out of the ordinary from every other time you'd ever seen the car?

A.   No.

Q.   Okay.  Had you ever known that vehicle to have any sort of mechanical problems?

A.   No; because it's a --

Q.   Could he -- let me ask you this, could he fix that car if any -- if something went wrong with it?

A.   I think that's why he would not get rid of it.

Q.   Okay.

A.   Because the newer stuff he could not work on it as --

Q.   My brother-in-law's a Baptist minister and he does the same thing.  He doesn't buy the new cars because they got all the computers and he --

A.   Right.

Q.   -- can't fix them.

A.   That's -- he just -- he loved stuff he could master.

Q.   Okay.

A.   I mean if something wrong with it, he just about would fix it himself.

Q. Okay. He never mentioned to you anything about that car having any sort of engine or tire trouble or anything like that?

A. Nothing.

Q. Okay. When did you first find out that Mr. Lane had been killed?

A. It were that night because the officer called me -- the officer from Creola or wherever it was from.

Q. Uh-huh.

A. And they was trying to determine was it another body in the car.

Q. Okay.

A. And -- which I told them nobody -- I was one of the last places that he left, and so they did get in touch with me, and I don't know.

Q. Do you know how they found your name? Did they ever tell you how they came to know to call you?

A. No, I don't.

Q. Have you ever talked with anybody

# 2.

# Deposition Excerpts of Gregory Cully

## FREEDOM COURT REPORTING



COPY

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

FRANK H. KRUSE, as                        \*
Administrator of the Estate of            \*
Paul L. Lane, deceased,                   \*

                                 \* Case No.

           Plaintiff,                  \* CV-07-0399-C
                                 \*

vs.                                       \*
                                 \*

CHARLES V. DURBIN; HIGHWAY                 \*
TRANSPORTATION, INC., and ALFA            \*
INSURANCE CORPORATION,                    \*
                                 \*

           Defendants.                 \*
                                 \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

     The testimony of GREGORY CULLY, taken at
the law offices of Miller, Hamilton, Snider &
Odom, LLC, 254 State Street, Mobile, Alabama, on
August 21, 2008, commencing at 10:53 a.m.

**367 VALLEY AVENUE**

# FREEDOM COURT REPORTING

A.     I measured approximately one thousand, one hundred seventy feet that the vehicles traveled before coming to final rest.

Q.     Is that almost four football fields?

A.     Basically.

Q.     Now, can you tell me what else you did as part of your investigation? I think you drew that up and you typed up the accident report?

A.     That's right. I talked to some of the witnesses. I believe there was a witness that was actually going south on the highway and she tried to snap a photograph on her cell phone. You could see the fire and that was it, nothing else.

Q.     What did she tell you, to the best of your knowledge?

A.     According to her, she said there was a vehicle and all she saw was the lights of the truck and the next thing you know she saw a big ball of fire.

Q.     Did you meet with this witness personally?

A.     No. I talked to her on the phone.

Q.     And when did you talk to her?

A.     I believe it may have been two days after that. I believe she was on her way -- if I'm not

36

A.    He passed the Wal-Mart.  The Wal-Mart is two exits -- the next exit back.

Q.    Right.  Did you get that information from talking to someone yourself personally?

A.    Either I did or one of the detectives did.

Q.    Did Mr. Durbin tell you that there were no lights on the vehicle?

A.    I don't believe he -- the only thing I remember him saying, all of a sudden he was driving along and all of a sudden there was a big ball of fire in front of him.  I believe if he would have saw a vehicle with no headlights on he would have braked for them.

Q.    Say that again.

A.    I said, I believe if he would have seen a vehicle with no headlights on he would have taken evasive action.

Q.    Have you talked to any of these witnesses that are listed on this report since a week or two within the accident?

A.    Within the first couple of days, that was it.

Q.    You've seen the picture that Tracy Burton had, she's the witness listed on here, you've seen the

# 3.

# Deposition Excerpts of Steve Stephens
# and
# Exhibit 42

## FREEDOM COURT REPORTING

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

CIVIL ACTION NO.: 07-0399-C

FRANK H. KRUSE, as the Administrator of The

Estate of PAUL L. LANE, deceased,

Plaintiff,

vs.

CHARLES V. DURBIN; HIGHWAY TRANSPORT,

INC., et al.,

Defendants.

VIDEO DEPOSITION OF STEVE STEPHENS

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the video deposition of STEVE

STEPHENS may be taken before LAURA R. FANT,

Court Reporter and Notary Public, at the Law

Offices of Ball, Ball, Matthews & Novak, 2000

### 367 VALLEY AVENUE

110

it will not see as far or you will not be able to perceive as far. But if something is refracting back, something designed to reflect light back, your distance may exceed what you are saying is a standard for a headlight. A good example of this, I noticed this the other night driving back from Mobile when I was down there, in this area. You would have your headlights out there 2, 3, 400 feet but out 5, 600 feet out, you're picking up the reflectors on the roadway. And you're seeing those. They're well outside the normal what we call range of a headlight but you're getting retraction back. It depends on the reflectivity of the object being lit.

Q Do you have any evidence that -- let me ask you this: Have you seen or inspected an exemplar Crown Victoria like the one Mr. Lane was operating at the time of the accident?

A I used to drive one.

Q I was fixing to say I'm sure you --

A I used to drive one.

Q But since you -- I mean, y'all

changed vehicles a lot of times since the '86 Crown Vic.

A    Sure.

Q    Have you gone back and looked at a '86 Crown Vic before this case?

A    No, sir, I have not.

Q    All right.  When you inspected the remnants of Mr. Lane's vehicle, did you find any reflectors on the back of his car?

A    The reflectors would not been there because they were probably destroyed during the crash or burned.  The reflectors themselves are built into the taillight assemblies.

Q    Okay.  All right.  Do you have any evidence that those were actually on his vehicle at the time of the accident?

A    There's no reason to believe they were not because the light assembly would have to be intact that point.  Even if the taillights are out, even if they're burned out, the reflectors are still there because it's part of the housing.

Q    I guess what I'm asking you though

152

there.   Charles Vincent Durbin was operating his vehicle in excess of the posted speed limit time at the time of the collision.

Q   All right.  What facts do you have to support that conclusion?

A   Starting out, we would get an officer's measured distance of 1,170 feet.  With that if you take a distance of measuring around the actual circumference of the travel path, it's actually 1,236 but I consider the 1170 for the time being.  We can do it both ways.  The question becomes how much speed does it take to maneuver that distance.

We've got a situation here where this commercial vehicle has struck a car in the rear end, overrode it up to the B-pillar and is now sitting actually on top of the car pushing it along.  The driver states that he does actual apply brakes.  This is consistent with the physical evidence.  You've got a situation here in this photograph showing braking.  You've got tire marks being left, some of them are tandems; second set showing some tandem marks; the third

176

hereto.)

BY MR. MONTGOMERY:

Q All right. I've marked as Defendant's Exhibit 21, can you tell me what that is?

A This is going to be the calculated speed if you take the distance which is the full distance of 1,236 feet. That's going to be the total travel distance circular. And using the full drag factor of .85 and adjusted for the brakes, just the rear trailer only and you will get a speed of a approximately 86 miles per hour.

Q Okay. Now, that one's kind of doing reverse math where you've got -- you've got the distance now, you're going to go back and try to find the speed, whereas in this one you had a speed and a coefficient, then you found the distance?

A Correct.

Q So you're just kind of going in reverse order on this calculation?

conclusion?

A    No, sir.

Q    All right.  Are you of the opinion that Paul Lane in any way contributed to this accident?

A    I find no evidence to show where he may have been contributing.  The belief is going to be traveling at a low rate of speed and the vehicle was overtaken, should have been seen, was not.  This is not a situation where it was a sudden pull out in front of the oncoming path of the truck, it's there.  I do not see any cause for Mr. Lane at this time.

Q    How slow of a rate of speed do you think he was going?

A    An estimate, he's probably mid 40s.

Q    Mid 40s?  What did you base that on?

A    Just an overall looking at the vehicle, information provided earlier about the vehicle moving at a low rate of speed from the truck driver.  I think there's a possibility or a strong possibility he is driving slow obviously because of the tire problem.  And he

had told a friend about it earlier on the telephone. Also you got a situation where the truck had overrode it, but not to a vast amount. It's not a complete override. It goes up to the be B-pillar but stops and then the vehicle assumes the travel path of truck. It appears to be a very smooth action, not a severe strike to the rear, bending the rear of the car up.

Q    All right. Now, that leads me to my next question which is you know that there's person out there that saw this accident happen?

A    Yes, sir.

Q    Are you going to tell me then that you think that she was mistaken to the point that she took a car that was stationary on the interstate, she mistook a car going 40 miles an hour as being stationary on the interstate?

A    Take a look at the scenario that she's having to deal with.

Q    That's yes or no? I mean --

MR. REBARCHAK: He can answer and give his opinion.

BY MR. MONTGOMERY:

Q    Well, I mean, that's not a hard question.  I mean, you either don't believe that she saw a car sitting still or she saw a car sitting still but you think it was going 40 miles an hour.  I mean, feel free to explain it but I mean --

A    Sure.  I think she saw the car by her testimony.  I think she's mistaken what the car is doing.

Q    Okay.  And you don't -- I know you've not spoken with her, but do you basically just for one reason or another not believe her version of events?

A    You got to look at where she's at.

Q    Okay.

A    She is at least in this case, thinking about it, she is probably 1200, 1600 feet away.

Q    Okay.

A    And she is working at a fairly sharp angle.  She's in line with this vehicle pretty much.  So her perception of this car approaching, if it slowed could be perceived

possibly as stopped.  She is the only one who's saying this car is stopped other than the driver of the truck, who never sees the vehicle at all until the impact.  So could her perception be that it is stopped, could she be mistaken?  I think that's what happens here in this case.  Provided she sees this accident as she has described.

Q      So basically you just think she's mistaken?

A      I think she's mistaken insofar as what the car is doing.

Q      And I mean, do you think 40 miles an hour is slow?

A      40, 45 is slow, but is it unreasonable?  No, not in a case where you got a situation where you've got a tire going.

Q      What do you know about the tire?

A      The only thing I know about the tire is from Mr. Rebarchak who has told me of an individual the driver has called, it's going to be a friend who the driver called prior to the incident.  Said he was having a problem with a

A   With the orange paint, that paint was still on the roadway.

Q   Okay.   I thought they had to -- did they only blacktop the area up front, is that what it was?

A   Yes.

Q   Okay.   Have you talked to anyone from the Saraland Fire Department?

A   No, sir.

Q   All right.   Defendant's Exhibit 8 is a section of the Alabama Code, Section 32-5-242. That was included in the materials that you produced pursuant to the Duces Tecum.   What is the significance of this particular Code section and how does it relate to your opinions in this case?

A   5-242 is simply going to be the requirements of the head lamps.   If you'll take a look here, visibility, distance and the heights of lamps is a(1). The section here in respect to a vehicle without load upon a straight level unlighted highway, and I'm going back to aspheric conditions.

This should be where your lighting should be set to.  Coming down to B/1, there should be an upper most distribution of light or a composite beam so aimed at such intensity as to reveal a person in vehicles at a distance of at least 350 feet from all conditions of loading.

The second one there is for the low beam headlights.  It's setting a distance here of a hundred feet minimum must be seen.  Keeping in mind this is from information provided from SAE guidelines from 1985.

Q    Okay.

A    Headlight has obviously improved over time.  These are the minimum standards, you're obviously going to be getting more light than this.  It would not reasonable to drive out here on a vehicle and only be able to see a hundred feet in front of you.  You won't be driving very fast, if that was the case.  This is simply setting the minimums as required by law.

Q    Okay.

A    Okay.  In addition section C or --

FREEDOM COURT REPORTING

222

as much as possible because it provides more light and allows people to see further down the roadway.

Q   All right.  And you're just using this as a guideline or a basis for headlight -- headlight distance?  I mean, I don't think -- I mean, how does this play into your opinions, I guess is the question --

A   On that one it's simply -- it's simply placing the -- the minimal requirements for the headlights.  We know they're more than that but it ties in specifically With 32-5-240.

Q   All right.  And we have that as well as Defendant's Exhibit 9. You need it?

A   I've got one here, sir.  Specifically here 32-5-240(1)(c), at any time when there is not sufficient light to clearly render discernible persons on the highway, this is 500 feet.  The vehicle must be displaying headlamps.  So they have to be on.  This section is specifically what I looked at, is under tail lamps, which is C(1). And it says, it shall be equipped with at least one tail lamp

223

mounted to the rear, which when lighted as required emits a red light plainly visible from a distance of 500 feet to the rear.  The first part of the taillights lit.

The second part of this code is 32-5-240(g)(1).  No new motor vehicle first sold on or after January 1, 1950, other than a truck, tractor, motorcycle, motor driven cycle, shall be operated on a highway unless the vehicle carries on the rear either as a part of the tail lamps or separately two red reflectors.  And section two of that, they shall be mounted so as to be seen at night from 300 feet away.

Q    Okay.

A    That's the coding for the tail lamp section.

Q    All right.  And I guess if Mr. Lane's vehicle had no lights on, and had no reflectors in the dark at 11:15 at night, then he would be in violation of those two Code sections?

A    Those two sections, if that is the case, he would violate those.

Q    That's what I'm asking you.  Assume

224

that is -- assume that that is what the eyewitness says.

A    If that was the case, yes.  Keeping in mind there are other reflectors back there.

Q    Okay.  And if he was going less than 40 miles an hour on the interstate, he would be below the minimum speed allowed on an Alabama interstate?

A    Not by this section.

Q    Okay.  What do you mean?

A    It has to be posted.  The minimum speed has to be posted to be applicable.  In this case it's not posted in that area.

Q    Are you familiar with the Alabama Administrative Code of the Alabama Highway Department?

A    Vaguely.

Q    All right.  Are you require that section 150-3-1-.11 set the minimum speed limit in Alabama on interstates at 40 miles an hour?

A    That would be in conflict with 32-5(a)-174, the minimum speed regulations.

Q    What does that say?

A       No person shall drive a motor vehicle in a speed -- a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation, or in compliance with the law.

Q       Uh-huh.

A       And the subsection below that, section B says that manner shall be affective when posted upon appropriate fixed or variable signs.

Q       Okay.  So you're saying that there's no minimum speed limit anywhere on the interstate unless it's posted?

A       According to the Alabama Code here, correct.

Q       Okay.  All right.  All right.  Have you had a chance to look over Defendant's Exhibit 5?

A       Briefly, yes.

Q       All right.  Are you going to be offering any opinions about in violations of the federal Motor Carrier Safety Administration

Q   Okay.  Tell me -- explain that to me then.  What would you have expected to find had the vehicle been stopped?

A   Stopped, you are going to see much more of a push probably on the rear bumper.

Q   Okay.

A   Forward, in this case it looks like it's more of an override as in two vehicles matching speeds coming up on each other, and moving on top, I would expect to see that.  You would possibly even more gouging than what you're seeing now out there on the roadway on the initial point because you see the gouging initially on the photographs, then it lifts up and it's not as severe as it was.  So I don't believe the vehicle sitting still when it gets struck.

Q   Can you -- from the damage that you see here, can you completely rule out the fact that it was stationary based strictly upon the visual damage to the car?

A   Absolutely, a hundred percent, no.

Q   Okay.

# FREEDOM COURT REPORTING

263

A.     That is the information she gave for me.

Q.     Okay. All right. Did you ask her of anyone else by name in your interview?

A.     She did not know any names.

Q.     Okay. All right.

Now, then, Defendant's Exhibit 42.

A.     This is a diagram that I had her do.

Q.     Okay. All right. Can you tell me what it shows?

A.     What I was trying to understand when I was talking to her was where she was when the incident stopped. So I had her to draw a rough diagram.

I drew the road in. I had her place the vehicles in where they were. According to her, she stopped prior to reaching the final rest position of both vehicles, and it is so depicted on the paperwork here.



# SOUTHEAST
# COLLISION ANALYSIS, INC.
ACCIDENT RECONSTRUCTION SPECIALISTS
Commercial Drive South • Brunswick, Georgia 31525
Tel: (912) 267-6900 • Fax: (912) 267-9748

DEFENDANT'S
EXHIBIT

42

CASE NAME / NO. _____

SCALE _____ SHEET # _____ OF _____

PREPARED BY _____ DATE _____

APPROVED BY _____ DATE _____

# 4.

# Deposition Excerpts of Charles V. Durbin

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

SOURTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

* * * * * * * * * * * * * * *

FRANK H. KRUSE, as
Administrator of the Estate
of Paul L. Lane, deceased,

        Plaintiff,

VS.

CHARLES V. DURBIN, HIGHWAY
TRANSPORTATION, INC., and
ALFA INSURANCE CORPORATION,

        Defendants.

* * * * * * * * * * * * * * *

ORIGINAL

CIVIL ACTION NO.

07-0399-C

The deposition of CHARLES V. DURBIN,

taken at the law offices of

Ball, Ball, Matthews & Novak, P.A.,

One Timber Way, Suite 200, Daphne,

Alabama, on the 4th day of February

2008, commencing at. approximately

10:22 a.m.

363 Pine Hill Drive / Mobile, AL 36606
Tel: (251) 479-1818   Fax (251) 479-1874

Q       And why not?

A       Department of Transportation regulations don't allow it.

Q       Okay.  Well, how many hours do they allow you to drive?

A       Eleven hours.

Q       So you could do eleven hours in one day and two the next?

A       Correct.  If it was a 13-hour trip, that is correct.

Q       Or you could do five and eight or six and seven?

A       Correct.

Q       It's up to you to determine that?

A       Yes, sir.

Q       And what were you carrying on this trip?

A       Glacial acrylic acid.

Q       Is that a hazardous material?

A       Yes, sir.

Q       Did you have to use a respirator at all on that?

A       No, sir.

Q       Do you carry that same type of substance

Case 1:07-cv-00399-C    Doc# 52-1    Filed 10/21/08    Page 39 of 109    PageID# 507

MR. MONTGOMERY:

No. He knows.

A        I understand that. I understand that.

MR. REBARCHAK:

Q        Okay. I thought it was on 9-6. But okay. 9-6, that was when you got home --

Well, let's just break that up. 9-6, you arrived at 9 o'clock at the terminal. Then you went home.

A        Correct.

Q        Correct? Then you came back to work on the 7th.

A        Correct.

Q        At what time?

A        Approximately 8:15.

Q        Okay. And how do you know that?

A        Because in reviewing the records with my lawyer, that's when I was due to load.

Q        Okay.

A        And it's my habit to get there so that I arrive at the shipper approximately 15 minutes before my loading time.

Q        Okay. What did you do on, I guess, on

the 6th?  You got off at -- I guess you came in at 9 a.m., came home, did family stuff?

A          Right.

Q          Okay.  What time do you usually go to bed?

A          Anywhere between 9 and 10:30 at night.

Q          Had you had anything to drink at all?

A          No, sir.

Q          Do you drink alcohol?

A          No, sir.

Q          Do you smoke?

A          Yes, sir.

Q          How many cigarettes -- I guess how many packs or something like that?

A          Actually, I'm down to a pack or less a day.

Q          At the time of the incident, how many were you smoking?

A          I probably smoked somewhere around a pack or a little more than a pack a day.

Q          Okay.  Do you recall what time you went to bed the night before, on the 6th?

A          No.

Q        Do you know what time you'd wake up?

A        It would have been around 6 or 6:30 in the morning.  Probably about 6:30.  But the specific time I woke up that morning, no, I don't recall.

Q        Okay.  And what do you usually do when you wake up in the morning?

A        Shave, shower, drink my coffee.  When I first get up in the morning is when I take my medication for the day.  And then I start my regular day, whatever I'm gonna do that day.

Q        Okay.  And how far are you away from the terminal?

A        Two miles.

Q        So you probably left for the terminal a little after 8:00?

A        Left for the terminal?

Q        Yeah.

A        Yeah.

Q        Was your wife living with y'all at this time or was she in Michigan still?

A        My wife's lived with me continuously for the last eleven years.

Q        What I'm saying is at one time she was still up in Michigan when you were down in Texas. Correct?

A        Yes.

Q        Okay.  At this time, was she in the same house with you at the time in September of 2006?

A        Yes.

Q        Okay.  Any of your kids live with you?

A        No.

Q        Okay.  So you went to work about 8:15 or 8:30, I think you said, that morning?

A        I departed the terminal about 8:30.

Q        Okay.  And is there anything you did to review to determine what time you left?

A        No.

Q        Go ahead and tell me what happened then when you left the terminal.

A        I drove to the shipper, scaled in, checked in with the traffic department.

Q        When you said go to the shipper, who's that?

A        That would have been Rohm and Haas.

Q        Okay.  Do they have an office there?

particular driver's truck broke down and he's unable to drive it, the company needed to service a customer and go pick up the load, it's their prerogative to say go take that truck there and go get your load.

Q        Okay.  You left about 8:30 that morning; right?

A        Yes, sir.

Q        Okay.  And where were you headed?  I guess you told me you went to -- got your truck and went over to get loaded up.  And what time did you leave out, I guess, of Deer Park?  Do you know?

A        Between 2 and 3 in the afternoon.

Q        Okay.  What are you doing from, I guess -- I guess you're getting loaded.  It takes that long to load from being there about 8:30 to almost five or six hours to load up?

A        I was probably finished loading somewhere around 10 something in the morning, and the rest of the time was waiting for paperwork.  And I would have been in my sleeper sleeping.

Q        Okay.  Why would you be sleeping if you just slept all night long, just got up?

Q        Okay.  Did you pull off?

A        I pulled in to a rest area.

Q        Rest area.  Is this one of these certified rest areas for Highway Transportation?

A        No, sir.  It's a State-run rest area.

Q        Okay.

A        Like a welcome center, except just a rest area.

Q        And what did you do there?

A        It was late enough in the day, I may have ate a sandwich, and I spent time in the sleeper.  I don't know how much of that time I slept, but I did sleep some, because there was nothing else to do, and there was no sense getting out on the road and sitting behind the wheel and just sitting there with the truck running, because I wasn't going anywhere.

Q        Uh-huh.  Okay.  How long were you off the road?

A        Probably close to two hours.

Q        And the best you can recall, it was at some truckstop -- not a truckstop but a rest area, like a State-owned rest area?

bag with your shaving kit and underwear in it, these types of things.

Q        Okay.  Now, last I think we talked, you had pulled over, I think you said --

Was it someplace at a rest area in -- Was it in Texas or Louisiana?  I can't remember.

A        Texas.

Q        Texas.  Okay.  And you said you think you stayed there about two hours?

A        Yes, sir.

Q        And then you got back on the road?

A        Yes, sir.

Q        Where'd you go from there?

A        Nowhere except driving.

Q        Okay.  When was your next stop?

A        My next stop would have been Saraland.

Q        Did you have enough gas to go from La Porte all the way to Saraland?

A        Yes, sir.

Q        Okay.  How many miles is that?

A        450, 425, somewhere in mid-forties, four hundreds.

Q        Okay.  Had you stayed at the Saraland

place before?

A          Yes, sir.

Q          Okay.  Is that where you were planning on going that night?

A          Yes, sir.

Q          Did you pick that over -- opposed to the Theodore one?

A          Yes, sir.

Q          Why is that?

A          Due to the hour, past experience, the size of the Theodore truckstop, the difficulty getting into or out of it without having an accident.

Q          What about the Gulfport one?

A          There was no need to stop there, so, no, I didn't consider it.

Q          Okay.  Why didn't you want to stop there?

A          Because I was still awake, alert, and ready to drive.

Q          Okay.  What time was it when you were coming through Gulfport?

A          I don't know.

Q          Okay.

Case 1:07-cv-00399-C   Doc# 52-1   Filed 10/21/08   Page 47 of 109   PageID# 515

MR. REBARCHAK:

Monty, do you want to take a break at all?

(LUNCH RECESS.)

MR. REBARCHAK:

Q        Mr. Durbin, I asked you about why didn't you stop in Gulfport, and you said you were alert, you were fine, you didn't feel like you needed to stop there.

A        That's correct.

Q        Do you drink coffee on your trip?

A        Yes.

Q        Okay.  Is that something you have like a little coffeepot or something that you make on your trip, or do you just stop on a regular basis to get coffee, or tell me about it.

A        I stop on a regular basis and fill a thermos and have a thermos in the truck.

Q        Okay.  Do you do any type of NoDozes or any other type stimulants to keep you awake at all?

A        Absolutely none.

Q        Does the company recommend you do anything if you're feeling a little tired or

anything like that?

A          Other than maybe rolling down a window or turning up the music or something just until you can get to a place to stop.

MR. MONTGOMERY:

He's asking what the company recommends that you do, not what you might do.

THE WITNESS:

No.

MR. REBARCHAK:

Q          Okay.  And you said you didn't stop at Theodore because it was late and wasn't a good place to stop to get in and out of simply because you may -- It's kind of hard, and you may get in an accident going in there.

A          Yes.  It's a left turn in and out of there, and traffic coming, you have to make a very hard right-hand turn coming out of there.  And there's been occasions where I've been in there and almost been hit trying to get out of there.

Q          Okay.  And you decided to stop in Creola or at Saraland stop; correct?

A          Correct.

Case 1:07-cv-00399-C    Doc# 52-1    Filed 10/21/08    Page 49 of 109    PageID# 517

A          Yes, sir.

Q          You said you looked to your right to see if there was anybody coming in on the ramp, the entrance ramp?

A          Just prior to the accident, yes.

Q          Okay.

A          I looked to the right for exiting traffic and so forth at the exit ramp.

Q          And then you looked to your side view mirror, you said?

A          I looked to my side view mirror prior to going underneath the overpass after I had looked at the off ramp.

Q          Okay.  Did you take your eyes off the road?

A          Other than to check the ramps like I've just said, no.

Q          How long was that?

A          Second.

Q          Okay.  Did you take any evasive action to avoid Mr. Lane's car?

A          There wasn't time.

Q          Did you see Mr. Lane's car before the

PLAINTIFF'S EXHIBIT

Case 1:07-cv-00399-C     Doc# 52-1     Filed 10/21/08     Page 50 of 109     PageID# 518

accident?

A        No, sir.

Q        What happened after the accident?  Or take that back.  When did you first know you came in contact with Mr. Lane's car?

A        At the point of impact.

Q        Okay.

A        Let's put it this way.  At the point of impact, I knew I hit something.  So I'm assuming it was --

I'm on the expressway.  I'm assuming it's a vehicle.

Q        Okay.  What did you do next?

A        I can't say specifically.  I was knocked around from the impact, and I reoriented myself, realized what was going on, and I put my brakes on.  And by this time, his vehicle and mine were both engulfed in flame.

Q        Did you put your brakes on before you got in flames or after flames?

A        I can't tell you how fast or when it happened.

Q        Did the cars come to a stop before it

A        Because of the terrain and the openness where the accident happened, had there been headlights, taillights, brake lights, hazardous warning, it would have been impossible not to see them.  It's not around a curve, up a hill, down a hill.  It's flat ground.

Q        Uh-huh.

A        So had they been on, I would have seen them.

Q        Okay.  So there was no reflectors on the car?

A        None that I saw.

Q        Well, let me ask you this.  How far do your headlights go out?

A        I don't know specifically.  I'm guessing 300 feet.  About the same as your car.

Q        And you're sitting up higher.

A        Yes, sir.

Q        And you did not see the car at all prior to that accident.

A        No, sir.

Q        And your response is that had he had, in your opinion, had he had his brake lights on or

flashing lights on or whatever, you would have seen that.

A          Without a doubt.

Q          But you didn't see the car prior to the accident.

A          No, sir.  Had I seen it, I would not have hit it.

Q          Okay.  Do you think you would have seen the car had you not turned to the right to look on the entrance ramp or in your side view mirror?

A          No, sir.

Q          Okay.  And you couldn't see it, an object with your headlights on.  Did you have your headlights on?

A          Yes, sir.

Q          Could you see on that road without your headlights?

A          Don't know.  I've never tried.

Q          Have you ever come across a deer on the highway before?

A          Yes, sir.

Q          Okay.  Have you been able to see the deer?

# 5.

# Deposition Excerpts of Rakesh R. Patel, MD

RAKESH R. PATEL - 8/7/2008

Case 1:07-cv-00399-C    Doc# 52-1    Filed 10/21/08    Page 54 of 109    PageID# 522

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FRANK H. KRUSE, as           :
Administrator of the         :
Estate of Paul L. Lane,      :
deceased,                    :
     Plaintiff,              :
                             :
VS.                          : Civil Action No. 07-0399-C
                             :
CHARLES V. DURBIN; HIGHWAY:
TRANSPORTATION, INC.; and :
ALFA INSURANCE               :
CORPORATION,                 :
     Defendants.             :

---

ORAL DEPOSITION OF

RAKESH R. PATEL, M.D.

AUGUST 8, 2008

---

ORAL DEPOSITION OF RAKESH R. PATEL, M.D., produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on August 8, 2008, from 12:25 p.m. to 1:56 p.m., before Jo Ann Kelley, CSR in and for the State of Texas, reporting by machine shorthand, at the offices of Rakesh R. Patel, M.D., 10611 W. Fairmont Parkway, La Porte, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Depo Dynamics
(888) 494-3370

Page 37

RAKESH R. PATEL - 8/7/2008

prescription, I guess, is it Avidol?

A. Oh, Avalide?

Q. Yeah, Avalide, is that in there?

A. Yes.

Okay. There is Avalide in here. This is -- it starts right here.

Q. Okay. Where does it talk about the side effects?

A. The side effects are in this box right here. And it tells you percentage of people that possibly could have it compared to -- compared to someone on the placebo, which is like a sugar pill.

So, it has dizziness as 8 percent. But even the sugar pill they have 4 percent of the people complaining of dizziness. Fatigue, it has 7 percent. But even in the sugar pill, I mean, even 3 percent of the people complain of fatigue even in the sugar pill. If you look up drowsiness, they don't have drowsiness as the common side effects.

And then in the smaller print here, it talks about some of the uncommon side effects. They have drowsiness in the uncommon side effects. This is written in this sentence.

Q. It appears it says adverse reactions. Where does it say uncommon --

RAKESH R. PATEL - 8/7/2008

A.    It says:  The following adverse experience reported in occurring in less than -- greater than 1 percent and/or more often than placebo.

Q.    Okay.  And one --

A.    The next sentence is:  The following adverse events were also reported at a rate of 1 percent or greater, but were as or more common as the placebo. So, some of them were as common as placebo were.  So, sometimes if it's a small percentage and if someone complains of a side effect but it's also mentioned in the placebo group, then they put it in there, in paragraph form, and not in the table.

Q.    In the table -- in the table for the drug that you're prescribing, that Mr. Durbin was on in September 6th, 2006, drowsiness -- is it drowsiness or tiredness in there?

A.    In the common side effects?

Q.    Right.

A.    That one is just fatigue.

Q.    Fatigue?

A.    Yeah.  That one -- that says 7 percent and the placebo is at 3 percent.  So, even people who weren't getting the medications complained of fatigue even though they weren't getting any ingredients in their pill.  So, that's how they compare it in this

4db54ae2-f493-4af3-81de-98a249fd481d

RAKESH R. PATEL - 8/7/2008

chart.

Q.    And isn't it a lot of times people that have high blood pressure complain of tiredness?

MR. SHEEHAN:  Object to the form of the question.

A.    Only if it's way out of control.  If it's within limits or almost controlled, it's usually not common, no.

Q.    (By Mr. Rebarchak)  Would it appear that Mr. Durbin's -- you were constantly treating his high blood pressure, weren't you?

MR. SHEEHAN:  Object to the form of the question.

A.    Yes, we were treating his high blood pressure.

Q.    (By Mr. Rebarchak)  And that he came at times to modify his blood pressure and get it under control so he could pass his DOT physical, correct?

MR. SHEEHAN:  Object to the form of the question.

A.    Not only for the physical but for his general health.  We like to keep the blood pressure controlled so it doesn't trigger any other complications later.

Q.    (By Mr. Rebarchak)  And, Doctor, you are

4db54ae2-f493-4af3-81de-98

RAKESH R. PATEL - 8/7/2008

reading out of the PDR which is Physicians' --

A.    Desk Reference.

Q.    -- Desk Reference, which you rely on for making your opinions, correct?

MR. SHEEHAN:    Object to the form of the question.

A.    I rely on this -- the monthly prescribing reference a little more often just because it has the more commonly seen side effects.  The PDR I use if I see something unusual or different than what is usually common.

Q.    (By Mr. Rebarchak)  Okay.  Are you of the opinion that a side effect of the drugs you were prescribing at that time, one of them is tiredness or fatigue?

MR. SHEEHAN:    Object to the form of the question.

A.    Tiredness is a possible side effect of the blood pressure medication.

Q.    (By Mr. Rebarchak)  And your opinion is based on a reasonable degree of medical certainty?

MR. SHEEHAN:    Object to the form of the question.  What opinion are you talking about?

MR. REBARCHAK:    That the medication he was taking, the side effect was tiredness.

4db54ae2-f493-4af3-81de-98a249fd481d

Page 49

RAKESH R. PATEL - 8/7/2008

A.    Tiredness, not drowsiness.

Q.    (By Mr. Rebarchak)  Tiredness is written in the common form for the drug that we had talked about; I think it was hydrochlorothiazide?

MR. SHEEHAN:  Objection, form.

A.    No.  Actually Avalide.

Q.    (By Mr. Rebarchak)  Which is -- that's a brand name for hydrochlorothiazide, isn't it?

A.    No.  It's a brand name for Irbesartan/hydrochlorothiazide.

Q.    And one of the common side effects of that is tiredness?

MR. SHEEHAN:  Object to the form of the question.

A.    Fatigue.

Q.    (By Mr. Rebarchak)  Fatigue.  And that opinion is based on a reasonable degree of medical certainty?

MR. SHEEHAN:  Objection to the form of the question.

A.    No.  It's based on what's written in the PDR.

Q.    (By Mr. Rebarchak)  And that's something that doctors rely on all the time?

MR. SHEEHAN:  Objection to form.

4db54ae2-f493-4af3-81de

RAKESH R. PATEL - 8/7/2008

Q.   (By Mr. Rebarchak)  Well, let's say, it's produced by the drug manufacturers or doctors?

A.   It's made by the drug manufacturers.

Q.   And the opinions you have given today, Doctor, are based on a reasonable degree of medical certainty, correct?

MR. SHEEHAN:  Object to the form of the question.

A.   It's based on my training and experience.

Q.   (By Mr. Rebarchak)  Well, you are a medical doctor, aren't you?

A.   Yes.

Q.   So, based on a reasonable degree of medical certainty?

MR. SHEEHAN:  Object --

A.   Yes.

MR. SHEEHAN:  -- to the form of the question.

MR. REBARCHAK:  I think that's all I have.

THE WITNESS:  Okay.

MR. REBARCHAK:  I take that back.

Q.   (By Mr. Rebarchak)  Why did Mr. Durbin call you last night?

A.   He stopped by the office when I had finished

# 6.

# Deposition Excerpts of Lane VanIngen

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

CIVIL ACTION NO.: 07-0399-C

FRANK H. KRUSE, as the Administrator of The

Estate of PAUL L. LANE, deceased,

Plaintiff,

vs.

CHARLES V. DURBIN; HIGHWAY TRANSPORT,

INC., et al.,

Defendants.

COPY

DEPOSITION OF LANE VANINGEN

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between the parties, through their respective counsel, that the video deposition of LANE VANINGEN may be taken before LAURA R. FANT, Court Reporter and Notary Public, at the Law Offices of Ball, Ball, Matthews & Novak, 2000

**367 VALLEY AVENUE**

(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

A    Per his testimony?

Q    Please, sir.

A    Continued driving towards the scene of the accident.

Q    If you will, log that for us.

A    Okay.  And again, we are -- unlike my reconstruction that logged in Eastern time, we are doing Central time, correct?

Q    All right.  Have you -- now, that's September the 7th?

A    Yes, sir, that's correct.

Q    As I understand it, you got him in the sleeper berth from the beginning of that day until 8:15?

A    Actually I have him off duty beginning of that day to 8:15.  I have him in the sleeper from 9:00 a.m. to 3:00 p.m. and then again in the sleeper at 4:30 to 6:30 p.m.

Q    Okay.  And then the rest of the day is driving?

A    Yes, sir.

Q    And how many hours was he in the sleeper berth?

complete the log assuming that he was on-line for on duty not driving from the time of the accident until approximately midnight?

BY MR. SHEEHAN:

Q     Let me ask you this:  Would he be in violation based upon that log that you prepared there, Defendant's Exhibit Number 71?

A     Say this again.

Q     Is he in violation of any regulations based upon those two logs that you prepared?

A     Yes.

Q     Okay.  And where is the violation?

A     He would have driven after 14 hours on duty starting at 10:15 p.m. for an hour leading into the accident.

Q     And where is your --

A     From 8:15 in the morning when he came on, 14 hours expires at 10:15.  He drove a full hour after that and was in violation of the 14 hour rule at impact.  Based on the assumptions that I've just made and that's consistent with my reconstruction opinion.

Q     Let's look at your reconstruction.

the situations I have worked on, I can't point at any -- anything that I can say, the GPS was not correct based on this.

The fact of the matter is, you know, the driver said what time he left, estimated it, we know what time the accident happened, and without even having the GPS, I know he was in violation of the 14 hour rule because more than 14 hours had elapsed from the start time to the end time and there was no qualifying eight-hour break in the middle.

Q    On Defendant's Exhibit Number 38 what information are you relying upon to log the entries you have on this particular exhibit?

A    Primarily the GPS data and the scaled ticket that we've marked as an exhibit.

Q    If you'll identify that information, please, sir?

A    I'm not sure what you want me to do.

Q    What information do you have for the first entry there, Defendant's Exhibit Number 38, La Porte, Texas?

A    Am I supposed to include things that

because they are not.

Q    Okay.  So you are not trying to imply that there was any violation there?

A    No, sir, I'm not.

Q    You just didn't complete the computer program; is that fair?

A    I didn't give it all the information it needed, and it spit out a violation, that's all.

Q    Okay.  I understand that.  All right.  If you can, help me there with that 9/2/06 shift time.

A    The shift time violation on 9/2 is similar to the violation that we've just discussed that was present at the time of the accident.  It's a 14 hour violation.  Shift time is how the computer program analyzing my reconstruction identifies a 14 hour violation. Right under it on that same day 9/2, you'll notice that there was a driving time violation. That's the computer's way of categorizing an 11 hour rule violation.  So shift time is a 14 hour violation, driving time is an 11 hour violation.

# 7.

# Deposition Excerpts of Karen L. Kelly, MD

## FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

FRANK H. KRUSE, as the Administrator

of the Estate of PAUL LANE, deceased,

Plaintiff,

vs.          CIVIL ACTION NO. CV 07-399

CHARLES VINCENT DURBIN, HIGHWAY

TRANSPORT INC., and ALFA INSURANCE

COMPANY,

Defendants.

COPY

*    *    *    *    *    *

DEPOSITION OF KAREN L. KELLY,

M.D., taken pursuant to notice and

stipulation on behalf of the

Plaintiff, at the Alabama Department

of Forensic Sciences, 8160 University

Drive, Montgomery, Alabama, before

Bridgette Mitchell, Shorthand

22

are put in the cooler for overnight and then they will be brought out the next day for their autopsy.

Q. Can you explain to the ladies and gentlemen of the jury how you performed your autopsy or your examination of Mr. Lane's body in this case?

A. As I said, we start with the external examination, documenting whatever we see with our eyes and taking pictures of that. Externally, Mr. Lane was severely burned. And, basically, the remains only consisted of fifty pounds of remains, charred remains, that measured thirty-six inches in length, so about three-feet long. The internal organs were exposed. The liver and, I believe, the lung tissues were exposed. A lot of the brain structures were absent or fractured from the fire and a lot of the neck tissues were missing. The

a reasonable degree of medical certainty what caused the death of Mr. Lane?

A. Yes, I do.

Q. Okay. What is that?

A. It was blunt force trauma, multiple traumatic injuries from the car accident.

Q. Can you be a little more specific, if you have an opinion, as to what specifically happened to cause his death? I mean, I know he got hit by the car, is what you're saying. Is there anything physically? Like did his head get crushed, did his heart get crushed? What stopped him from breathing?

A. Well, what -- his chest -- I don't know what happened to his head because there wasn't -- because of the fire, there wasn't enough left that I could tell if he had any head injuries. But the chest injuries

30

that occurred were most likely from striking the steering wheel or the front of the car as he was hit from behind. He would continue to move even though the car was moving forward or if it was moving forward he was pushed forward into the steering wheel and hit his chest on that which would cause the tears of the aorta and then he would bleed -- then he was bleeding into the chest cavities from the aorta.

Q. Did y'all do any toxicology reports at all on Mr. Lane?

A. Yes, we did.

Q. Okay.

A. And we looked for any evidence of alcohol or volatile chemicals such as methanol, isopropanol, or acetone, and those were all negative.

Q. Okay. Now, I think you said the cause of the death, in your opinion, was because of the car wreck, being

38

you can tell me if you recognize it.

(Plaintiff's Exhibit 2 was

marked for identification and is

attached to the original of the

transcript.)

A. Yes, I do.

Q. Can you tell the ladies and gentlemen of the jury what that is?

A. Again, it's a copy of the file on Mr. Paul Lane.

Q. That's a file kept in the ordinary course of business at your office?

A. Yes.

MR. REBARCHAK: Monty, do you have any objection to the authenticity? You may not want --

MR. MONTGOMERY: No, authenticity is fine.

MR. REBARCHAK: Okay.

MR. MONTGOMERY: I reserve other objections.

Q. (By Mr. Rebarchak) Dr. Kelly, is there any question that I haven't

FREEDOM COURT REPORTING

39

asked you about the autopsy or any area of the autopsy that I have not asked you about that you feel is significant in this case?

A. Well, I think it's important just to clarify that because I was able to identify hemorrhage and blood within the chest cavities, that indicates that Mr. Lane was alive at the time that he -- his car was struck. Because if he had been unconscious or his heart was no longer beating for some reason, the blood would not have been going through the aorta and would not have gone into the surrounding tissues that were injured.  So the fact that we have hemorrhage in both chest cavities and hemorrhage in other organs and tissues of the body indicates he was alive and his heart was pumping and beating at the time that he was struck.  He did then die from his

40

injuries prior to the fire.

Q. Okay. Thank you very much.

MR. REBARCHAK: Monty, you have any questions?

MR. MONTGOMERY: I have a couple just for my own education.

CROSS-EXAMINATION

BY MR. MONTGOMERY:

Q. I think I know what ethanol and methanol are. What is isopropanol?

A. It's a different type of alcohol. It's an alcohol.

MR. REBARCHAK: That's rubbing alcohol, isn't it?

THE WITNESS: Yes, it's rubbing alcohol.

Q. (By Mr. Montgomery) And what about -- do you find people ingesting rubbing alcohol?

A. Yeah. Oh, yeah.

Q. What's an acetone? What would we find that in?

A. Acetone's usually a breakdown product

# 8.

# Deposition Excerpts of Scott M. Ennen

Case 1:07-cv-00399-C    Doc# 52-1    Filed 10/21/08    Page 76 of 109    PageID# 544

# FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

CASE NUMBER:  CV-07-0399-C

FRANK H. KRUSE, as the administrator of the

Estate of Paul Lane, Deceased,

           Plaintiff,

           vs.

CHARLES VINCENT DURBIN, et al.,

           Defendants.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Scott M. Ennen may be taken before Angela Smith McGalliard, RPR, CRR, at the offices of Ball, Ball, Matthews & Novak, at 2000 Interstate Park Drive, Ste: 204, Montgomery, Alabama 36109, on the 11th day of January, 2008.

DEPOSITION OF SCOTT M. ENNEN

FREEDOM COURT REPORTING

**367 VALLEY AVENUE**

Case 1:07-cv-00399-C   Doc# 52-1   Filed 10/21/08   Page 77 of 109   PageID# 545

what information do they have in their truck regarding, you know, satellites?

A.      Each chemical truck at Highway has a Qualcomm satellite with a display keyboard.

Q.      Where is that displayed?

A.      It's off to the driver's right, near the passenger's side of the truck.

Q.      Okay.  And what information does he get from that?

A.      It's a message back and forth from his managers.  He starts his trip by using that, he records loading and unloading times using that device via satellite.

Q.      Okay.  Now, do we have any information from the satellite for that day?

A.      Pole positions.

Q.      Pole positions?

A.      Yes.

Q.      Okay.  And pole positions are positions you guys recognize.  Does he have to key those in or do you get them from a

GPS tracking system?

A.    It's automatic with the Qualcomm system.

Q.    And you've produced that for that day; correct?

A.    Yes.

MR. MONTGOMERY:    I think we got them for like three months or six months out, whatever DOT requires us to keep.

A.    We went back as far as we could.  That's it right there.

Q.    This (indicating)?

A.    Yes.

MR. MONTGOMERY:    They go back to March 9th, so six months out.

Q.    Okay.  Was there any type of communication with him during the day?

A.    I don't know if there was or not.

Q.    Okay.  Do you -- Can you communicate to him through the satellite?

A.    Text messages, yes.

Q.    Do you have a list of any text

messages at all on that -- for that day?

A.    I don't know if -- I don't know if we checked that or not, to be honest about it.

Q.    Okay.

MR. REBARCHAK:  Monty, I'd like, if you guys could, produce any messages he has.

MR. MONROE:  Yeah.  I'll follow up.

Q.    It's my understanding that the satellite system, you guys can text message each other, send messages?

A.    Yes.

Q.    And he can send them back to you?

A.    That's correct.

Q.    If there was any messages sent during that period time, you would have been able to have them on record someplace?

MR. MONTGOMERY:  I'll tell them to look for them.  If they're there, I'll get them to you.

A.    I don't know how long we keep text messages.  The pole positions we keep six months.

Q.    Right.  And you produced those.

A.    Yes.

Q.    What about these initial or rough drivers trip settlement sheets, do you guys have those?

A.    I'm not sure what you're talking about there.

Q.    Okay.

A.    Whatever payroll records we've provided.

Q.    Okay.  Fuel tickets, like where they bought fuel and all for that drive, do y'all have that information?

A.    I'm not sure if that's still available.  I'm not sure.

Q.    Okay.  If it is, can y'all produce that?

MR. MONTGOMERY:  Sure.

Q.    For example, where he got some

Case 1:07-cv-00399-C Doc# 53-1 Filed 10/21/08 Page 81 of 109 PageID# 549

our discovery request?

MR. MONTGOMERY: Yeah. Sure.

THE WITNESS: That's a really simple thing to get.

Q. What about any type of safety meeting attendance registers or sign-in for your safety meetings, do you have that information or do y'all have regular safety meetings?

A. We have regular safety meetings. I haven't produced any. I checked that everything we had, and I could not find Vince's name on any of the registers.

Q. Okay. How often do you have your safety meetings?

A. We try to have them quarterly. At least three times a year, but we try quarterly.

Q. Okay. How far did you go back to look for Vince?

A. I went back to some records in 2002.

FREEDOM COURT REPORTING

Page 72

Q.     You couldn't find Vincent on any of the safety records?

A.     No.  We have a sheet that we ask them to print their name, sign their name, date and time, and what we talked about, and I didn't see his name on any of them.

Q.     Are these mandatory meetings that they're supposed to go to?

A.     If they're available, yes.

Q.     So it's possible that you could have a driver like Vince for five years that never attended a safety meeting?

A.     It's likely.  He could be working and on the road and unavailable for a safety meeting.

Q.     So even though they're supposedly mandatory safety meetings, I guess, they're mandatory if they're in town?

A.     If they're able to come to the meeting, yes.

Q.     There's no company policy that they have to attend X, Y, Z, so many safety

(Exhibit No. 5 was marked

for identification.)

Q. Okay. I'm showing you what's

marked as Plaintiff's Exhibit Number 5. Can

you tell me what that is?

A. That is a violation detail

report on Charles Durbin, first page is

March 2006.

Q. Okay. Explain to me what

these are. Total number of violations, one.

Is that right?

A. That's correct. One

violation.

Q. What is the violation?

A. Falsification fuel stop, Pilot

64, Sumterville, South Carolina, 3/28, 6:37

p.m., not noted properly.

Q. Why is that a violation?

A. He may have logged a fuel stop

off duty, instead of on the bottom line; or

it could be a time zone difference that the

computer can't catch.

Q. Okay. Is he reprimanded for

this?

A.    Depends if he falsified a record.  If it's simply just a time zone issue, Sumterville, South Carolina, is Eastern Standard Time, Vince is logging out of Central Standard Time because he's out of the LaPort, Texas, terminal.  In that case it would not be a violation.

Q.    You don't know whether that's what this is or not?

A.    Not for this, no.

Q.    But it says falsification at the top.

A.    Here (indicating)?

Q.    Yes.

A.    Yes.

Q.    You guys don't look at these and research these?

A.    A violation report is printed out and sent to the driver for his comments.

Q.    Where is his comments for this?

A.    I don't have those.

Q.    Will you get those for me?

A.    I will look.

Q.    If he was falsifying fuel tickets, is that something he could get terminated for?

A.    It really depends on if it was willful and deliberate. But this is not an uncommon write-up.

Q.    On the next page you have violation detail, I think it says, on April 10, 2006. What is that?

A.    Signature on the log was missing or illegible.

Q.    Okay. How is that corrected?

A.    We look at the log on the screen. And this is an automatic write-up that the audit engine writes down. We just let the driver know.

Q.    Does he have to report to this?

A.    Pardon me?

Q.    Does he have to respond to this?

Case 1:07-cv-00399-C   Doc# 52-1   Filed 10/21/08   Page 86 of 109   PageID# 554

A.      We send out letters monthly, and we ask for their comments.

Q.      Okay.  Do they respond in writing?

A.      Yes.

Q.      Okay.  Are they in his file?

A.      I could not find them.

Q.      Where would they be?  Are they supposed to be in the file?

A.      If he received them and signed for them and turned them back in, yes, they would be in the file.

Q.      Okay.

A.      These are sent directly to his manager, and it's up to his manager to issue these things.

Q.      Okay.  If they're not in the file, does that mean he didn't either receive them or didn't respond to them?

A.      That's correct.

Q.      Is it company policy that you're supposed to respond to all these?

A.      Yes.

Q.      Is it grounds for termination if you don't respond to them?

A.      Possibly.

Q.      Okay.  Tell me about the next one.

A.      4/21/2006, falsification fuel Pilot, 40 Oak Creek Wisconsin at 4:21, 2:43 a.m., not noted properly.

Q.      What could that be?

A.      It could be that he logged it off duty, instead of on duty not driving.

Q.      What about the next one?

A.      It's another falsification, fuel stop, Pilot 336, Dubose, Pennsylvania, on 4/24, at 12:12 p.m., not noted properly.

Q.      You don't have any record of him responding to any of these?

A.      I could not find any, no.

Q.      Okay.  Next page?

A.      On 5/7, falsification of fuel stop, Pilot 311, Eerie, PA, and May 7, 7:14 p.m., not noted properly.

Q.      Do you know if there is any

response to this?

A.      No.

Q.      What about the next one?

A.      A driving time, eleven hour violation on 6:30 p.m., of 5/08 7:15 p.m., he drove three-quarters of an hour past his eleven-hour driving limit.

Q.      He can drive eleven hours a day?

A.      He can drive eleven hours within fourteen and then he's got to take a ten-hour break before he can drive again.

Q.      Okay.  That's a severity two?

A.      Yes.

Q.      Okay.

A.      5/17/2006 another fuel stop violation.  Charlotte, North Carolina, May 17, 11:02 a.m. not noted properly.  And then on May 29, Pilot 144, Augusta, Georgia, 8:42 p.m., not noted properly.

Q.      What about the next day?

A.      It's a June audit, June 19, 2006, speeding violation.  He had a daily

average of seventy miles an hour, and we start writing them up on an average of sixty-five for a daily average.

Q.    Is that what the daily average is supposed to be, sixty-five?

A.    Our policy is at sixty-two mile an hour for a daily average.

Q.    And why do you have a sixty-five max on this report?

A.    That's Trip Pack doing that, not Highway.

Q.    Okay.  What is that that leads you to believe if he's averaging seventy miles an hour?

A.    It's the miles he reports driving that day versus the miles that he reports driving.

Q.    Okay.

A.    Many times that's either he's reported too many miles or he hasn't recorded his driving time properly.

Q.    Okay.  Could he be going too fast?

# FREEDOM COURT REPORTING

Page 107

A.    We don't have trucks that go that fast.

Q.    How fast is that?

A.    They're all governed for sixty-eight miles an hour.

Q.    For how fast?

A.    Sixty-eight.

Q.    How can he be going seventy then?

A.    That's for him to answer.

Q.    Okay.  Has he responded to this?

A.    No.  And as I said, that's generally when they recorded the wrong miles.

Q.    All your trucks are governed at sixty-eight miles an hour?

A.    All company-owned vehicles are governed at sixty-eight miles an hour, yes.

6/23 falsification, Pilot 336 Dubose, Pennsylvania, 1:05 p.m., fuel stop not logged properly.

Q.    What about the next set?

A.    That's July audit.  July 10, falsification, Pilot Franksville, Wisconsin, at 7/10, 12:03 p.m., not logged properly. Then on 7/26 another speeding violation, average 65.88 in a maximum 65 for a daily average.

Q.    Okay.

A.    Then August '06, fuel stop violation, Flying J, Texarkana, at 8/02, 10:08 p.m., not noted properly.

Q.    Okay.  Do you have anybody that checks these, whether or not the driver ever responds to these?

A.    I had a log audit clerk that is responsible for these letters.

Q.    And is she supposed to check this or he supposed to check this?

A.    They are sent to the terminal managers, it's their responsibility -- terminal manager or the driver manager, it's their responsibility to see that these are addressed by the driver and sent back to safety signed.

Q.    You mentioned something about your trucks only can go sixty-eight miles an hour?

A.    That's the way they're governed, yes.

Q.    Okay.  Is there any way for them to go higher than sixty-eight miles an hour?

A.    Down a hill.

Q.    Down a hill?

A.    Yes.

Q.    Is there anything you can do to make it go higher than sixty-eight miles an hour?

A.    Down a hill.

Q.    Just down a hill?

A.    Yes.

Q.    Is there any other mechanical thing you can do?

A.    Not to my knowledge.

Q.    So they're governed that way?

A.    Yes.  Through the electronics.

Q.    Is that usually -- Is that a

company policy?

A.    What?

Q.    Company policy to have them governed at sixty-eight miles an hour?

A.    That's correct.

Q.    So basically all your trucks are always going below the speed limit?

A.    In states where a maximum seventy mile an hour speed limit is, yes.

Q.    Okay.  So you don't have any truckers that have gotten any tickets at all for going over seventy miles an hour?

A.    Some contractors have received tickets and some drivers have received tickets going down hills.

Q.    How fast can they get going down hill?

A.    I'm not really sure.  I've seen speeding tickets seventy-five, seventy-six.

Q.    Okay.  Is there -- I see where you have total points.  Is there a certain amount of total points the driver gets

Case 1:07-cv-00399-C   Doc# 52-1   Filed 10/21/08   Page 94 of 109   PageID# 562

before he gets looked at?

A.      No.   That's a Trip Pack thing and we've never enacted that.

Q.      Well, why do you even do it if you don't act on it?

A.      Trip Pack does the points thing, Highway Transport doesn't.   It's just part of their engine.

Q.      Okay.   So what do you guys do with this information?

A.      We keep it in their file for a six-month period and evaluate it monthly.

Q.      Okay.   You've got all these violations and there's no report that he even responded or he received any of these?

A.      Not that I could find, no.

Q.      Okay.   So is that how you monitor to them?

A.      This is how we audit and check our logs, yes.

(Whereupon, Plaintiff's

Exhibit No. 6 was marked

for identification.)

Do you see that?

A.     The numbers are wore off on that. I think that's -- Is this it?

Q.     Yeah.   The one we talked about previously.

MR. MONTGOMERY:   That's it.

Q.     If you go down there it says -- under the health history it says: Eye disorders or impaired vision, paren, except corrective lenses, close paren and it's checked no; correct?

A.     Yes.

Q.     Okay.   So in February of '06 he has beginning of glaucoma, and he has eye disorders and impaired vision.   But his examination three months later, or approximately two and a half months later, he has no eye disorder or impaired vision or any mention of any type of glaucoma; is that true?

A.     Yes.

Q.     Did y'all follow up on this when you got these medical reports?

A.        I don't know.  I don't think so.

Q.        If you did follow up on it, would there be some note in his file or in some file?

A.        There may be, yes.

Q.        Okay.  Where would that file be?

A.        In this file if we did check.

Q.        It would be in this file that you guys produced if you did anything like that?

A.        Yeah.

Q.        Now on 302 -- 0302, I think on the next page there, it's also got under vision, it's got corrected thirty/thirty in both eyes; and then it's got -- where it says application, meets visual acuity requirement only when wearing -- doesn't have anything checked, does it?

A.        No, it doesn't.

Q.        Would that mean he wouldn't have to wear any corrective glasses then?

and you can make an exhibit, so I can keep from taking it out of there?

MR. MONTGOMERY:  That's fine.

MR. REBARCHAK:  All right.

Q.    Tell me about the night of the accident.  Were you on duty that night?

A.    I was not.

Q.    Okay.  Who was in charge of safety that night?

A.    Bill Regean was on call.

Q.    What happens when there's an accident?  Tell me about what happens then.

A.    The driver, if he can, calls Line Haul at Knoxville, which is manned twenty-four/seven.  Line Haul knows what safety person is on call and the phone numbers and places to call.

Q.    Do you know if that was done that night?

A.    Yes.

Q.    Okay.  How did he call?

A.    Who?  Vince?

Q.    Yeah.

EXHIBITS

A.      I don't know.

Q.      Do you think if he was not looking to the left and looking to the right and looking straight ahead, he could have seen this vehicle?

A.      I don't know.

Q.      Do you know if he took any evasive actions to avoid this accident?

A.      I don't know.

Q.      And Don Anders was the dispatcher at this time.  Is he open twenty-four/seven?

A.      We have somebody manning the phones twenty-four hours, seven.  We have what we call our Line Haul guys that work from six p.m. to six a.m., that work seven on and seven off.

Q.      Okay.  We had talked earlier going through some of these documents about he was in the sleeping cabin and various things prior to this incident.  I think there was -- we went through the logs on here.  I think it was regarding the time he

# 9.

# Deposition Excerpts of William Messerschmidt

FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

CASE NUMBER: CV-07-03999-C

FRANK H. KRUSE, AS ADMINISTRATOR OF THE

ESTATE OF PAUL L. LANE, DECEASED,

Plaintiff,

vs.

CHARLES V. DURBIN, ET AL.,

Defendants.

COPY

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of William F. Messerschmidt may be taken before Sara Mahler, CCR, at the offices of Ball, Ball, Matthews & Novak, at 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109, on the 18th day of July, 2008.

DEPOSITION OF WILLIAM F. MESSERSCHMIDT

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

97

conclusions.  In order for a driver of a 2003 Mack truck to perceive a 1986 Ford Crown Victoria in the distance, it would have to have -- would have had to close to within three hundred feet; is that correct?

A.      That's correct.

Q.      Okay.  If the vehicle was, let's say, five hundred feet away and he would -- in your opinion, would the Mack truck have been able to see it?

MR. MONTGOMERY:  Object to the form.

A.      Let me just make sure I understand what you're asking.  If when Mr. Durbin in the Mack is five hundred feet away from the Crown Victoria, under the assumptions that predicate my analysis, no, the Crown -- at five hundred feet, under those conditions, the Crown Victoria is not a salient hazard.  It's not salient and not -- it's not going to be recognizable as a hazard at that distance.

Q.      Would he be able to even see

FREEDOM COURT REPORTING

100

was quite a ways.

Q.        And she was able to see the vehicle, according to Mr. Stephens' deposition?

A.        One, Ms. Burton is looking at something that is back lit, which is a little bit different than looking at -- I mean, she's got the bright lights of the -- she's got the bright lights of the truck between her and the vehicle.  So to see something with the bright lights of the truck behind it, to see the shadow that they create -- that the vehicle might create by the headlights passing behind it or around it is different from seeing it.  Ms. Burton has some other inconsistencies in her deposition, and my analysis is not based on Ms. Burton's testimony.

Q.        Doesn't it sort of throw yours out the window if you believe Ms. Burton?

A.        I don't -- I didn't -- One, I didn't -- Ms. Burton has a perception of what happened that's her recollection,

Case 1:07-cv-00389-C   Doc#531   Filed 12/12/08   Page 103 of 109   PageID# 571

that's what she recalls.  I am not a forensic psychologist that could look into all that aspect.  She's looking -- She would -- Based on one way of reading her interview with Tony, with Mr. Stephens, she would be looking -- she would be seeing things differently with the lights behind -- with the bright lights of the Mack behind her than Mr. Durbin would.  But I'm not -- Ms. Burton has a recollection of the event, and it's not the basis for my opinions.

Q.    So she seen the lights from the truck on the vehicle?

A.    That's how she describes seeing -- What she describes -- As I recall her interview with Tony, she sees the lights shining up approaching the Crown Vic.

Like I said, her interview with Mr. Stephens and her assessment of the accident is not the basis -- The correctness of her memory in terms of physical events that occurred, don't form the basis of my opinions.  I mean, I prefer in any case, you

know, to base opinions on physical evidence whenever possible, or someone else's independent physical investigation, as opposed to witnesses' recollection. However, I don't remember how long it was until the time of the interview.

Q.      Could we plug Ms. Burton's recollection of this into this response/perception time?

A.      Can we put Ms. Burton?

Q.      Her information.

A.      The equation would be -- would be different.

Q.      How would it be different?

A.      We would be looking at Ms. Burton's ability to perceive her vehicle's motion relative to the Crown Victoria, so we'd be looking at that subtendon angular velocity. And that's one element. And then assuming that -- The perception/response time equation that you're looking at there is a driver's response to an immediate hazard. She never

is responding to an immediate hazard. It doesn't cross the road in front of her vehicle or anything like that, so that's outside the -- one of the basic assumptions of Mr. Muttart's research that -- you're looking at a driver's response to an easily identifiable, immediate hazard, not necessarily a driver's response time to something off in the periphery that might become a hazard or might be of interest, so . . .

Q.      Wouldn't you stop quicker if it was a hazard?

A.      I didn't quite -- Wouldn't who stop more quickly if what was a hazard?

Q.      Well, if it was a hazard, like you're talking about in these accidents or studies, isn't that somebody that wants to stop quickly?

A.      Yeah. That's somebody initiating an emergency response. That's a fundamental assumption of Mr. Muttart's research, is we're looking at drivers

104

engaged in --

Q.     Ms. Burton wasn't looking at any emergency stop, was she?

A.     Right.  And that's why I'm saying some aspects of that perception/response of -- human factors and perception/response, some aspects are applicable to or relative velocity detection for one.  But to just plug her testimony into Muttart's equation there in front of you, would defy that convention.  As I said, it's a response to an immediate hazard.

Q.     Do you believe Ms. Burton's testimony?

MR. SHEEHAN:  Object to the form.

MR. MONTGOMERY:  Same objection.

A.     I believe that's what she remembers.  I don't know that she has -- I don't know that she has any reason to be untruthful or to -- would she have any reason to telephony anything other than what

she remembered.  I believe that's what she remembers.  That's about as far as I'll go.

Q.     And it was your understanding that she could visibly see the car at least a hundred -- one thousand six hundred feet away --

MR. SHEEHAN:  Object to the form.

Q.     -- from the opposite lane with no reflectors?

MR. SHEEHAN:  Object to the form.

A.     She believes that that's how she remembers it.

Q.     Okay.  And your testimony based on all these studies and all these reports and all this scientific data you can -- basically what you're saying is, the maximum site line of three hundred feet was established as a point of which perception of the Ford Crown Victoria could have begun for Mr. Durbin who's directly behind him with his lights on and according to Tony

Stephens' discussion with Ms. Durbin (sic), she can see it for over sixteen hundred feet away?

MR. SHEEHAN: You mean the leading questions presented to her in that recorded statement, is that what you're asking him?

MR. REBARCHAK: Are you making an objection?

MR. SHEEHAN: Object to the form of the question.

A.        Ms. Durbin.

MR. MONTGOMERY: Ms. Burton.

A.        Ms. Burton. The scenario facing Ms. Burton is different in many ways from the scenario facing Mr. Burton -- from Mr. Durbin. Exactly how far away she was is not something I looked into. Basing it on Tony's interview with her is -- do I believe that her recorded transcript from her interview with Tony is --

MR. MONTGOMERY: What's the question?

107

MR. REBARCHAK: He's answering it.

A. -- is an accurate -- is a kinematically accurate, motion accurate depiction of how the accident happened. I will go no farther than to say it's an accurate reflection of what she remembers.

MR. MONTGOMERY: You do realize that his testimony is based on a formula for front-to-rear accidents; right?

MR. REBARCHAK: Is that a question, objection, or what?

MR. MONTGOMERY: I'm just wondering what -- I know you're trying to show that from sixteen hundred feet away she could see it, but that's not what -- that's completely different than how the accident happened. You realize that; right?

MR. REBARCHAK: Are you making an objection?

MR. MONTGOMERY: Don't let me interrupt you again. Go ahead.

Q. At a distance of three hundred